Claude GAINAR, Libelant,

v.

SS LONGVIEW VICTORY, etc., in rem,
and Victory Carriers, Incorporated,
in personam, Respondents.

John THORNTON, Libelant,

v.

SS LONGVIEW VICTORY, etc., in rem,
and Victory Carriers, Incorporated,
in personam, Respondents.

Otis SUMLER, Libelant,

v.

SS LONGVIEW VICTORY, etc., in rem,
and Victory Carriers, Incorporated,
in personam, Respondents.

Charlie HARRIS, Libelant,

v.

SS LONGVIEW VICTORY, etc., in rem,
and Victory Carriers, Incorporated,
in personam, Respondents.

Roland OWENS, Libelant,

v.

SS LONGVIEW VICTORY, etc., in rem,
and Victory Carriers, Incorporated,
in personam, Respondents.

York BRYANT, Libelant,

v.

SS LONGVIEW VICTORY, etc., in rem,
and Victory Carriers, Incorporated,
in personam, Respondents.

VICTORY CARRIERS, INCORPORAT-
ED, Impleading Petitioner,

v.

WHITEHALL TERMINAL CORPORA-
TION, Respondent Impleaded
(six cases).

Nos. 8200-8203, 8211, 8212.

United States District Court
E. D. Virginia,
Norfolk Division.

Feb. 10, 1964.

Kanter & Kanter, Norfolk, Va. (H. Lee Kanter and L. B. Sachs, Norfolk, Va.), for libelants.

Seawell, McCoy, Winston & Dalton (John W. Winston, Norfolk, Va.), for respondents and impleading petitioner.

Rixey & Rixey, Norfolk, Va. (Wm. B. Eley, Norfolk, Va.), for respondent impleaded.

WALTER E. HOFFMAN, Chief Judge.

The six libelants in the foregoing actions, consolidated for trial, were, at the time of their injuries, employed by Whitehall Terminal Corporation, a stevedoring concern, in their capacities as longshoremen. On the afternoon of March 5, 1961, they were loading conex vans of household effects and miscellaneous general cargo into the after end of the #3 lower hold of the LONGVIEW VICTORY, a VC–2–S–AP3 type vessel owned by the respondent, Victory Carriers, Incorporated, time-chartered to States Marine Corporation of Delaware and subtime-chartered to States Marine Lines, Inc. While the present actions were filed *in rem* and *in personam*, the vessel has not been arrested and the proceedings are solely *in personam* against Victory Carriers, Incorporated, a corporation properly served with process under Virginia law. Victory Carriers, while denying liability, has impleaded Whitehall seeking indemnity over in the event any damages or expenses are incurred by the shipowner.

The #3 hatch was only partially open during the entire loading operation. There were, in all, seven pontoons covering the main deck hatch #3, but only

four pontoons were removed from the after end by the stevedore who was in charge of the loading. An equivalent amount of wooden hatch board covering was removed from the two 'tween deck hatches. A part of the gang was at work by 1:00 P.M., opening the hatch and laying a dunnage floor in the lower hold where the vans, weighing as much as 8000 to 9000 lbs., but averaging 4000 to 5000 lbs., were to be stored for shipment.[1] By 2:00 P.M. two tractors had been lowered into the lower hold and were put in operation for the purpose of pushing the vans across the dunnage floor, assisted by greased skids attached to the vans.[2] The tractors were described as "two-ton"; one was gasoline powered, the other used propane gas. The evidence reflects that the tractors labor heavily when pushing cargo similar to the vans being loaded on the day in question.

Air temperatures on March 5 were warm for that time of the year. Commencing at 76° at 1 P.M., the temperature continued upward until 3 P.M. when it reached 83° and thereafter dropped to 82° at 4 P.M., 81° at 5 P.M., and 77° at 6 P.M. Water temperatures ranged from 43° at Chesapeake Lightship in the vicinity of Cape Henry to 53° at Portsmouth Naval Shipyard . The vessel was tied up on the north side of Pier 2 at the Hampton Roads Army Terminal—a location more protected than Chesapeake Lightship, but not as far up the river as Portsmouth Naval Shipyard. As the ship had arrived from New York on the previous day, it may be assumed that the colder water tended to slightly reduce the air temperature in the #3 lower hold while at Norfolk. The surface wind was light, with velocity readings ranging from 5 to 12 knots at varying times between 2 P.M. and 10 P.M. The wind was essentially out of the southwest with the vessel's bow headed east and docked, as previously noted, on the northern side of Pier 2. Thus, the wind from the southwest would create little or no ventilation to the vessel because of intervening buildings and the pier.

The vessel, along with many others of a similar type, was constructed near the end of World War II. The design calls for natural ventilation, rather than forced draft or mechanical ventilation. This system of ventilation is in use on many vessels and is approved by Coast Guard Merchant Marine Inspection Service. It is confined to two cowl type ventilators at the forward end of the #3 hatch, extending above the main deck. The cowls may be turned toward the wind and the air (if any) runs through a shaft extending downward below each cowl into the lower hold. The openings are approximately two feet square. At the after end of the #3 hatch are two fluted mushroom-type ventilators which are fixed and do not turn, but have baffle plates to keep the rain out. Each after end ventilator has a shaft extending down to the upper 'tween deck and, to a very limited extent,[3] exhausts air from the #3 lower hold.

No blowers were placed in the lower hold and, as noted, the vessel was not equipped with fixed mechanical ventilation. These facts were known by the stevedore foreman and the vessel's first mate. The Safety and Health Regulations for Longshoring adopted by the U. S. Department of Labor provide in

1. The #3 hold had been cleaned at Baltimore three days prior to March 5. Approximately 600 tons of tinplate had been loaded into the hold on March 2. This was the condition of the #3 lower hold when the longshoremen commenced laying the dunnage boards.

2. The second tractor was lowered into the hold a few minutes after 2 P. M. Both tractors were owned by Whitehall and the operators were employed by the same corporation.

3. The limited extent to which the mushroom-type ventilators assist in ventilating the lower hold is confined to such fumes as may pass from the lower hold, through the lower 'tween deck, and into the upper 'tween deck area. There was no exhaust ventilator in the #3 lower hold; only the cowl type intake ventilators reached to the #3 lower hold, and they were located at the forward end of the hatch.

§ 9.93 that, where neither natural ventilation nor the ship's ventilating system is adequate to keep the carbon monoxide content of the atmosphere in the hold below 100 parts per million, blowers are required when internal combustion engines exhaust into the hold. The failure to use blowers constituted a violation of safety requirements. Provenza v. American Export Lines, Inc., 4 Cir., 324 F.2d 660, cert. den. 84 S.Ct. 970. Subsequent to the accident in question the Coast Guard Regulations were amended to provide for substantially the same requirements. § 78.80–15(c), Special Operating Conditions, Federal Register, November 23, 1961. While the Court rejected evidence of the Coast Guard Regulation, it requires no expert to realize the dangers from carbon monoxide escaping in a confined area with limited ventilation. Indeed, the first mate and another stevedore testified that it was customary in the Port of Hampton Roads to use mechanical ventilation whenever tractors are put into the hold. And it seems elementary that all hatches should be open to the fullest extent to permit the fumes to escape.

The two tractors were in use until shortly after 4 P.M., when one operator went on deck for air. Shortly before 5 P.M. the stevedore foreman called down to the hatch boss to determine why the cargo was moving so slowly. Upon being advised that "this gas is bad down here," the stevedore foreman entered the lower hold. The stevedore foreman described the odor as "awfully bad, never smelled anything like it in my life." Work was thereafter knocked off, the other tractor stopped, and the longshoremen came on deck. Libelant Gainar was lifted out on a skid. All men were out of the hold by 5:30 P.M.

The first mate, charged with the responsibility for the safety of the vessel, had previously received word that the longshoremen in the #3 hold were complaining about fumes. He entered the hold, found the stevedore foreman present, and observed the longshoremen still at work. He noted that the atmosphere was somewhat smoky, but it did not appear to either the first mate or stevedore foreman that it was unsafe for the men to continue working. The mate inquired of the stevedore foreman whether blowers were available but was told that the stevedore did not own any. Both men returned to the deck and the work continued. The mate did not reenter the lower hold until he later learned that two men had been taken to the hospital. Upon his return the tractors had stopped and the men had finished or were finishing their work. Apparently both tractors were in fairly constant use between 2 P.M. and 4 P.M., and one tractor continued operating thereafter for an additional hour, or nearly so.

■■ While the fundamental design of the vessel was not unseaworthy for use when constructed, the use of tractors and like equipment in the lower hold of a vessel was not then commonplace as it is in the present day. True, a vessel to be seaworthy need not have the latest, best and most modern equipment, but when equipment is placed within a hold which knowingly emits a dangerous and invisible element such as carbon monoxide, it manifestly is incumbent upon the vessel to protect from such a danger. The obligation to provide a seaworthy vessel is a continuing one and seaworthiness as of 1944 does not infer seaworthiness as of 1961, especially where the equipment uses adaptable to the vessel have changed over the years.

Shortly before 7:00 P.M. the tractors were again placed into operation for a brief period of fifteen minutes at which time the stevedore foreman said the "odor was still there but not near as bad." At approximately 7:00 P.M. the vessel's representative sent for a chemical engineer to test the air in the #3 lower hold. Upon arrival at 9:30 P.M. the chemical engineer found that there existed a concentration of 100 to 150 parts per million of carbon monoxide. He satisfied himself that the carbon monoxide originated from the exhausts of internal combustion engines. It was his opinion—and it appears to be obvious

—that the concentration of carbon monoxide was significantly higher during the earlier hours while the men were working. The maximum safe limit for eight hours work is 100 parts per million of carbon monoxide to air; but this standard does not differentiate between types of labor being performed.

A highly qualified naval architect stated that there was approximately 1.9% of the amount of ventilation present which would be required to keep the concentration of carbon monoxide at minimum safe levels. This computation was on the assumption that wind averaging seven knots was blowing into the cowls.

The defense, in the main, rests in the explanation from the first mate, stevedore superintendent and stevedore foreman that they had never before heard of anyone becoming ill from carbon monoxide exposure occasioned by the use of motorized equipment in the hold of a vessel.[4] While we do not know whether identical situations have heretofore occurred, we think it too plain to permit argument as to the known propensities of carbon monoxide. For many years disturbed individuals have taken their lives by permitting carbon monoxide to escape in a confined area. Others, involuntarily, have become victims of gaseous fumes in their own homes. It is peculiarly strange that the mate even inquired about the availability of blowers although, at the time, he believed the working conditions to be safe. Such an inquiry is adequate proof of his knowledge of probable danger even at such an early hour.

Respondents rely upon Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412, wherein the longshoremen were injured when a last "shot" of grain, treated with a chemical insecticide, was loaded into the vessel. The fumigant had been improperly applied at inland grain elevators. The case has an extended history of litigation.[5] Without entering into a thorough discussion of this authority, it would appear to be an *ad hoc* decision predicated upon "the isolated and completely unforeseeable introduction of a noxious agent from without;" the improper application of the fumigant having been done by one who was not a party to the litigation, and without knowledge of such fact by the city or shipowner. Under such a situation it was held not to be unseaworthiness *as a matter of law*. The facts in the present case are entirely different. The Court has found that the introduction of carbon monoxide from the exhaust of the tractors was foreseeable to any average individual; it was to be reasonably expected in the use of internal combustion engines in a confined area not properly ventilated for such equipment. The damage was done, not as a last "shot" but over a period of several hours. The existing controversy is more in line with DeMarco v. United States, E.D.N.Y., 204 F.Supp. 290, and Turner v. Wilson Line of Massachusetts, D.C.Mass., 142 F.Supp. 264, aff. 1 Cir., 242 F.2d 414. Cf. Moore-McCormack Lines, Inc. v. Maryland Ship Ceiling Co., 4 Cir., 311 F.2d 663.

We conclude that the LONG-VIEW VICTORY was unseaworthy and, while the first mate was not directly in charge of the loading operation, his duty was to shut down the work when he knew or, by the exercise of reasonable care, should have known of the existence of an

---

4. Motorized equipment in the holds of vessels has only been in general use for a relatively few years. And we have no evidence of the use of such equipment as related to the use of mechanical ventilation.

5. The trial court held that the vessel was seaworthy and no negligence had been shown, 181 F.Supp. 202. The Fifth Circuit affirmed, 275 F.2d 191. On certiorari the judgment was vacated for reconsideration in light of Mitchell v. Trawler Racer, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, Morales v. City of Galveston, 364 U.S. 295, 81 S.Ct. 107, 5 L.Ed.2d 84. The Fifth Circuit reaffirmed its prior ruling, 291 F.2d 97. The United States Supreme Court then affirmed, 370 U.S. 165, 82 S.Ct. 1226, 8 L. Ed.2d 412, rehearing denied, 371 U.S. 853, 83 S.Ct. 16, 9 L.Ed.2d 93.

obviously dangerous condition. Negligence has been established. Both the unseaworthiness of the vessel and the negligence of the ship's officer proximately caused and contributed to the injuries sustained by the six longshoremen.

We turn to the damages which, for obvious reasons, will be considered separately as to Gainar and Bryant, and to a limited extent jointly as to the remaining libelants.

### Claude Gainar

The most seriously injured is the libelant Gainar. At the time of his injury he was nearly 40 years of age, apparently healthy, appearing to be of a jovial nature, and working steadily as a longshoreman. His earnings for the last calendar year preceding his injury, i. e., for the year 1960, amounted to $6,261.19. For 1959 he received $6,117.03. He was considered a "header" in his gang of longshoremen. A "header" is described to be immediately under the gang boss.

Gainar had been in the lower hold, without relief, from the inception of the work until he was carried out on a pallet. Presumably he labored continuously in moving the conex vans and other cargo. While there exists a sharp difference of opinion among the medical experts as to the effect of carbon monoxide exposure, as applied to the facts of this case, these experts substantially agree that the greater one exerts himself under such circumstances, the more the carbon monoxide will combine with the hemoglobin of the red blood cells.

The stevedore foreman noticed Gainar lying on some dunnage in a semi-conscious state when he entered the #3 lower hold shortly before 5:00 P.M. The foreman further testified that Gainar was able to "crawl" to the pallet which thereafter removed him from the hold and to the dock. He claims that he later noticed Gainar and Bryant on the dock and they were both conscious and talking. They were taken by tractor to Whitehall's office, with Gainar needing assistance to get aboard and Bryant climbing on the tractor unaided.

There is evidence to the effect that, around 4:00 P.M., Gainar assisted Charlie Harris who was likewise affected by the fumes. For what period of time (if any) Gainar may have lapsed into total unconsciousness, we have no way of knowing. Gainar did not testify in the case—it is apparent from his condition that such an effort would have been futile. Indeed, mere words are inadequate to describe the present condition of this libelant. He exists "in body" but without the ability to function as a normal man. His mental processes have become so disturbed that, while he is susceptible to pain and emotion, his total reaction makes him little more than flesh and bones which need attention for the balance of his life.

Because of the obviously substantial award which must be given to Gainar by reason of the great damage to his system, we approach any discussion of the expert medical or psychiatric evidence with some timidity. Gainar was initially seen by Dr. Clarence B. Trower, a general surgeon, at the emergency room of the Norfolk General Hospital around 7:15 P.M., approximately 30 minutes after Gainar and Bryant had been brought there by Whitehall's truck. Gainar was lying on a stretcher receiving oxygen; he was confused, quite lethargic and sleepy. Dr. Trower noted on the chart that Gainar was unconscious as a result of oxygen deprivation. In explanation of this notation Dr. Trower testified that he was more nearly "unconscious" than "conscious" but was able to move some. About 20 minutes later Gainar seemed to be improved, although he talked very little and complained bitterly of a headache. Admitted to the hospital that night, Gainar still complained of a headache the next morning, although he appeared to be oriented as to time, place and person, and was more alert as to details of what happened. On March 8 Dr. Trower, believing that Gainar was a "dull" man and in light of Gainar's statement that he wanted to return to work, discharged him as recovered from his carbon monoxide exposure. Gainar re-

turned to his home, complained that his head hurt and, a few days thereafter, fell while on the second floor. His wife describes him as a "completely changed personality;" she assists in dressing him and "pushes" him to attempt to shave himself. About six months after the injury Gainar again "fell out" while in a grocery store.

When Gainar was seen by Dr. Westmoreland on March 14—six days after being discharged by Dr. Trower—he was again hospitalized and Dr. Keith, a psychiatrist, was called into the case. Thereafter, and on subsequent hospital visits, he was seen by many doctors, including psychiatrists, neurosurgeons, internists and others.

In short, all medical experts agree that Gainar was and is a seriously ill man who is totally disabled. The principal dispute is whether he sustained organic injury to the brain or whether his symptoms indicate a serious psychiatric injury. On the libelant's side, tending to support the view that he is permanently disabled as a result of diffuse organic brain damage, is the testimony of psychiatrists (Drs. Furr, Keith, Zfass), a clinical psychologist (Dr. Spiegel) and an internist (Dr. Westmoreland). For the respondent, contending that organic brain damage could not have been brought about without an appreciable period of unconsciousness and that Gainar's problem is probably of a psychiatric nature, are a psychiatrist (Dr. Woodson), a neurosurgeon (Dr. Thomson) and a neurologist and internist (Dr. Bilisoly). Whatever view may be finally accepted, the seriousness of Gainar's condition cannot be disputed. From a psychiatric standpoint—as contended by the respondents—the prognosis is grave. Dr. Woodson expressed the opinion that Gainar had "some type of personality reaction, severe hysteria or psychosis" which, after many months, has deteriorated; he describes Gainar as a man of "limited intellectual endowment;" he

was hesitant to predict Gainar's future although, assuming the diagnosis of hysteria or some type of personality change, the condition "may relent" or "may disappear;" Dr. Woodson further conceded that such a supposition was a "pure guess" and that with the passage of time it is increasingly difficult to terminate. From the viewpoint of the psychiatrist, this is the most optimistic prognosis available. In any event, Dr. Woodson expresses no doubt that Gainar's condition is the result of carbon monoxide inhalation on March 5, 1961.

Dr. Thomson, an eminent neurosurgeon, refrained from any diagnosis or prognosis of psychiatric disorder. He saw Gainar on several occasions during March and early April, 1961, at which time he conducted a complete neurological examination with negative results. He testified that Gainar was mentating properly and was oriented as to time, place and person.

Dr. Bilisoly, a thoroughly qualified internist with experience in the field of neurology, first examined Gainar on June 17, 1961. Libelant was unresponsive, physically and mentally; he had an abnormal gait and a diminished arm swing; the neurological examination revealed a positive Romberg [5a] which was indicative of a neurological defect. However, from Gainar's motor or sensory functions, Dr. Bilisoly was unable to determine any basis for organic brain damage. The argument as to the absence of organic brain damage is grounded upon the contention that, absent a long period of unconsciousness, there can be no organic damage either with or without a lucid or latent period. In his study of the subject, only 43 individuals out of 14,572 cases of carbon monoxide exposure resulted in trouble thereafter and, according to Dr. Bilisoly, in each of the 43 situations a prolonged unconsciousness occurred at the time of the initial exposure. When confronted with Dr. Friedberg's text on "Diseases of the

---

5a. A positive Romberg is an indication that something is wrong in the posterior col- umns of the spinal cord having to do with the maintenance of balance.

Heart" (2nd Ed.), which states, "It has been emphasized that chronic disease of the nervous system and heart may develop even when there is no loss of consciousness from intoxication," Dr. Bilisoly disagreed with the author. Dr. Woodson was of the same opinion as Dr. Bilisoly. The toxicologist, employed by the Chief Medical Examiner of Virginia, expressed the view that a complete comatose period of approximately six hours is necessary to produce permanent brain damage, although he admits to having read of one case involving unconsciousness for one hour which produced organic damage to the brain.

The experts presented by libelant do not disagree with the fundamental rule that permanent brain damage is not *generally* known to result from carbon monoxide inhalation without a period of unconsciousness. In the main, they concede their inability to cite specific cases where permanent organic damage has resulted without unconsciousness. Nevertheless, they insist that, in Gainar's case, permanent organic brain damage exists. The diagnosis varies according to the choice of words.[6]

We believe it unnecessary to find, with respect to Gainar, the extent of his unconsciousness, if any; nor does it appear essential that we determine the interesting medical question as to the prerequisite of unconsciousness, and for what period, in ascertaining whether libelant has sustained permanent organic brain damage. While this Court leans to the view that, despite the general rule, Gainar has sustained some permanent organic brain damage, this is largely based upon observations of his actions, or rather lack of activity, during approximately eight trial days. Without regard to these personal observations, we think that the clear preponderance of the evidence establishes his mental and physical disabil-

ity for life. In short, death would be a blessing.

A person in this condition will gradually deteriorate. How long he will live is a matter of speculation—at least one expert estimated fifteen years from the trial date in 1962. If, in fact, he is now afflicted with Parkinson's disease, there would be a gradual destruction of muscle reflexes which could, in turn, bring about a fall or other accident. He will require drugs and quite probably will ultimately be sent to some type of institution or, from time to time, may require periods of hospitalization.

Based upon average annual earnings of $6150.00 per annum, Gainar has lost $15,375.00 as of September 5, 1963. The date of his birth was April 25, 1921. As of September 5, 1963, he was 42 years of age. Accepting the age of 65 as the normal work life, he has an expectancy of working life of 23 years, assuming his ability to work. Discounted at 3½% (15.620) his loss of future earnings aggregates $96,063.00. His total loss of past and future earnings would aggregate $111,438.00 but, by reason of the hazardous occupation of a longshoreman, together with occasional strikes and other periods of unemployment for a variety of reasons, the earning loss will be fixed at $100,000.00. Medical bills due or paid to doctors, including psychiatrists and psychologists, aggregate $2,353.00 as of the final trial date on October 17, 1962. Accrued or paid hospital bills total $1,694.65. An estimate of the drug bill is $400.00. These commonly referred to out-of-pocket expenses aggregate $4,147.65.

■ Gainar argues that *he* is entitled to recover the fair and reasonable value of his wife's services to him occasioned by necessary nursing care and attention; such amount to be computed to the date of trial and the value of services to be

---

6. Dr. Spiegel testified "organic damage was clearly present and to a fairly severe extent." Dr. Furr referred to Gainar's condition as "chronic brain syndrome, associated with carbon monoxide intoxication." Dr. Zfass agreed with Dr. Furr's diagnosis but added the words

"with neurological manifestations, namely Parkinsonism." Dr. Keith, who saw Gainar on 71 occasions, diagnosed the situation as "severe chronic brain damage with minimal psychiatric symptoms at this time with Parkinson's disease."

rendered in the reasonably foreseeable future. As enumerated by the wife, the services consisted of (1) applying alcohol following his first fall at home, (2) obtaining medical prescriptions, (3) taking him to the doctor's office, (4) assisting him in shaving and dressing, (5) telephoning for his medical appointments, and (6) presumedly aiding him in most of his activities. The theory advanced by libelant to sustain a recovery on this issue is the collateral source doctrine. While recoveries have been freely permitted where injured parties have received benefits provided by third parties, under the principle that a wrongdoer should not be entitled to profit by the gratuitous acts of another, this Court entertains grave doubts as to the limits that the collateral source rule should be extended in husband-wife relationships, especially under Virginia law. The difficulties in distinguishing between customary duties performed by any wife in maintaining a home, caring for children (seven in the Gainar family with the oldest being 10 years of age as of July, 1962), washing, cleaning, cooking, etc., and evaluating extraordinary services rendered by the wife to the injured husband, are innumerable. It must be conceded that there is authority sustaining the position that a husband may recover from the party responsible for his injury the reasonable value of nursing services or other care rendered by the wife. See: 90 A.L.R.2d 1330, and cases collected therein. There is likewise reputable authority rejecting such right of recovery since the husband is not liable to his wife for the care and attendance rendered by her to him. 90 A.L.R.2d 1331, 1332. Advocating a recovery in such a situation tends to strike at the familial relation in the absence of express loss of earnings by the party rendering the care and attention to the injured spouse. Quite a different set of facts may be presented where a person sustains a financial loss by reason of providing care and attention. Moreover, Virginia law on the subject should be persuasive, if not binding. While Gain-

ar's claim is to be distinguished from an action for loss of consortium, Carey v. Foster, D.C., 221 F.Supp. 185, public policy in Virginia may dictate against allowing a recovery such as asserted with respect to this phase of the damages. In assessing damages allowed to libelant the Court will disallow any claim for the fair and reasonable value of the wife's services occasioned by necessary nursing care and attention. However, in anticipation of an appeal, while the ability to determine an appropriate amount is extremely difficult, if such a claim is properly allowable under the facts and circumstances of this case, the Court expresses the view that $7,500.00 would be fair and reasonable.

Acknowledging the fact that there will be future expenses for drugs, hospitalization, and some attendant care (in addition to that provided by the wife) with probable admission to a hospital for the mentally ill under § 37–125.1 of the Code of Virginia 1950, as amended, or, in the alternative, afforded board and lodging with a private family pursuant to § 37–128 of the Code of Virginia 1950, such hospitalization or boarding care to be for a limited period after libelant's condition has further deteriorated, an additional item of $15,000.00 will be considered as reasonable for these elements of damage.

For the destruction of his life, including pain, suffering, mental anguish and embarrassment, libelant is awarded the sum of $100,000.00.

A decree in favor of the libelant Gainar will be entered in No. 8200 against the respondent Victory Carriers, Incorporated, in the sum of $219,147.65, with interest from the date of the entry of the decree at the rate of 6% per annum.

York Bryant

While some of the comments made with respect to Gainar are equally applicable to the libelant, Bryant, the two cases, from a damage viewpoint, are entirely different.

Bryant was born on March 17, 1917. He was, therefore, 44 years of age at the time of his injury. His testimony is es-

sentially valueless. He doesn't remember who told him to go into the hold, or when; he has no recollection of talking to the stevedore foreman in the 'tween deck area when it is reported that he was in the process of coming up from the lower hold shortly after 4:30 P.M.; he doesn't recall leaving the ship or how he came out; nor does he have any recollection of being on the dock, getting aboard the tractor, or going to the hospital. He recalls a nurse awakening him at which time he was lying down.

The stevedore foreman passed Bryant in the 'tween deck on the foreman's way to the lower hold to investigate conditions shortly after 4:30 P.M. He saw Bryant in the #1 'tween deck, sitting down in a stooped position, and told him to go to the forward end and use the escape hatch. He previously asked Bryant if he needed help and Bryant replied in the negative; thereafter Bryant left the 'tween deck through the escape hatch. As heretofore noted, Bryant was seen on the dock and then boarded the tractor to go to Whitehall's office. He also entered the truck and there is evidence to the effect that Gainar assisted Bryant, although it is possible that this situation was reversed. There is credible evidence to the effect that Bryant went on deck for a brief period during the loading operations as he replaced Sumler, another libelant, at some time between 3:30 and 4:00 P.M. Bryant had been replaced by Wilson at approximately 3:30 P.M.

When seen at the hospital by Dr. Trower at approximately 7:15 P.M. that night, Bryant was on a stretcher, conscious, drowsy, and complaining of a severe headache. He had previously been given oxygen. Bryant answered a few questions but gave no details of what happened, other than some words concerning "towmotors." The following morning Dr. Trower described Bryant as not lethargic, drowsy or sleepy. Like Gainar, Bryant was discharged on March 8, 1961, as being well oriented as to time, place and person, which conclusion was arrived at from general conversation and not specific tests.

Dr. Westmoreland first saw Bryant on March 16, 1961, and arranged for his later hospitalization. As with Gainar, Dr. Keith was called into the case. Bryant was discharged from the hospital the second time on April 27. He reentered the hospital on August 15 and remained until September 10. Following an attempt to work on February, 1962, he again spent 15 days in the hospital.

Beyond any shadow of doubt Bryant was, prior to the accident, and now is, mentally deficient. While Dr. Keith states that he has sustained mild organic brain damage, we think that, unlike Gainar, Bryant's problem is essentially psychiatric. Before his injury he functioned at a moderate level of mental deficiency. He sustained no neurological damage; the EEG and x-rays were all normal. The conclusion of the litigation will, in all probability, help the tension he is under. It will, in all likelihood, aid his condition. When examined by a clinical psychologist several months after the injury, Bryant's I.Q. was between 50 and 60, showing definite mental defectiveness.

Bryant was described as being a quiet man prior to March 5, 1961. He remains quiet but since the accident his wife describes him as disagreeable and "very forgetful." Few specific changes have been noticed in his actions, although he apparently, for psychic reasons, is not presently able to function as a longshoreman. As Dr. Woodson said, "This is a man with a psychoneurotic reaction, who regards himself as a disabled and acts accordingly."

Amounts due or paid to doctors, including psychiatrists, psychologists, etc., aggregate $1,844.50. His hospital bills amounted to $1,445.90.

The main force of Bryant's claim is that, prior to the incident of March 5, 1961, he was able to work as a longshoreman—even though mentally deficient—whereas now, for psychiatric reasons, he is apparently unable to work. Unlike Gainar, he did not work steadily. His earnings during 1959 were $2,027.59

and in 1960 were $4,496.83. While this is an average of $3,262.21, we are hesitant to approve of this figure as an overall average over a period of years for a man who was mentally deficient prior to his injury. Nor do we believe that he would have, but for the accident, enjoyed a working span of life to age 65. A mentally deficient man is more likely to sustain an injury in the course of his hazardous duties as a longshoreman. Accordingly, his average annual wage loss is fixed at $2,500.00, and his working life is terminated at age 60.

Bryant presents a complex case. He should undoubtedly receive extended psychiatric care over a long period of time, with visits to a qualified psychiatrist at least every two months. He may, in time, improve but the prognosis is not good as there is but very little to work with. The best that any psychiatrist could ever accomplish with Bryant would be to get him back at work. The prognosis is not good, but there should be some improvement with the termination of litigation. A fair estimate of the cost of his future psychiatric care is $2,000.00.

Bryant's claim for attendant services is disallowed. If he needs attendant care at this time, he also needed it prior to March 5, 1961. Despite his mental deficiency he is able to get around unaided.

Computing his loss of earnings for a period of two and one-half years, we find that he has an actual loss of wages to September 5, 1963, in the sum of $6,250.00. As of this latter date, he is 46 years of age. He has a working expectancy of 14 years. His future earning loss, assuming that it is total, discounted at 3½% (10.921) is $27,302.50. Believing, however, that he will in due time be able to do light work of some type at a minimal wage, his future earning loss is reduced to $20,000.00.

An award for his pain, suffering, mental anguish, etc., is extremely difficult. His chief complaint is from headaches which, we believe, are primarily caused by tension. It must be remembered that the respondent is not responsible for his mental deficiency as it existed prior to March 5, 1961. Since the Court has endeavored to make Bryant whole from the standpoint of his wage loss, present and future, as well as his medical and hospital expenses, present and future, the claim for suffering cannot be considered in the same light as Gainar's award in view of Bryant's relative mental status before and after the injury. True, he has lost the enjoyment of earning a means of livelihood, if indeed he appreciates this fact. An award of $25,000.00 will be made for his pain, suffering, mental anguish, and aggravated mental deficiency.

A decree in favor of the libelant Bryant will be entered in No. 8212 against Victory Carriers, Incorporated, in the sum of $56,540.40, with interest from the date of the entry of the decree at the rate of 6% per annum.

| Thornton—No. 8201 | Sumler—No. 8202 |
|---|---|
| Harris —No. 8203 | Owens —No. 8211 |

These claims involve essentially identical patterns. The complaints are similar. A brief review will be sufficient.

### Thornton

Thornton, known as "Big Apple", states that he became "sick" around 3 P.M.; he went to the upper 'tween deck where he remained for approximately 30 minutes, and then returned to the lower hold until the stevedore foreman knocked off the work. He came to the main deck riding the pallet with Gainar. He missed 4 to 6 days during the first week following March 5 and, in total, he estimates that he has lost 18 to 20 days, including 10 to 12 visits to the doctor. His first visit to any physician was when he states that he went to see Dr. Westmoreland on March 13, 1961, and, at the suggestion of the doctor, he remained out of work for three days. Born July 14, 1922, he has been a longshoreman since 1943. His initial complaints were headaches, a choking pain in the chest, and a burning sensation in the eyes.

Apparently Thornton, at approximately 7:15 P.M. on March 5, continued working

in *another* hatch until 12:30 A.M. on March 6, despite his headache and pain in the chest. At no time did he become unconscious. He filed no claim under the Longshoremen's and Harbor Workers' Compensation Act.

Dr. Westmoreland testified that he first saw Thornton at his office on March 21—which date the Court assumes to be correct. His complaints were headaches, slight dizziness, a full feeling in his chest, sickness to his stomach but without vomiting, and some weakness in his legs. An EKG did not disclose any abnormal beats, although it did reveal some non-specific changes. He was given capsules for his headaches and told to return two days later. The second visit indicated no apparent change. An x-ray of the heart and lungs was negative. He was seen again on March 27 and 30 with no apparent change, and the capsule treatment for headaches was continued. He was next seen on April 20 at which time his headaches and nausea were somewhat better. On June 15 another EKG was done with the same certain non-specific wave changes noted. Visits on June 22 and July 7 brought forth a like type of subjective complaint. An examination on August 18 disclosed nothing. On March 24, 1962, a thorough examination was conducted, including another EKG, all with the same results as noted on the occasion of the initial EKG. On June 6, 1962—four days before the commencement of the trial—another examination and another EKG brought forth the same results. Dr. Westmoreland's bill was in the sum of $174.00; a bill for x-ray by Dr. Bodin was $10.00; the estimated cost of capsules for headaches was $60.00.

Dr. Westmoreland states his diagnosis as follows:

"A. I think he was exposed to this carbon monoxide, or the fumes, in the hold of the ship. I think that they did give him a certain degree of anoxia, and it resulted in some damage to the brain and also, I think personally that these changes in the electrocardiogram might mean something.

"Q. What would it mean, sir?

"A. Organic damage."

The doctor concedes that the non-specific type change of the wave segment can originate from many causes. While the chest pain has improved, Dr. Westmoreland contends that there has been damage to the heart.

Dr. Bilisoly examined the tracings and noted minimal changes, frequently referred to as non-responsive changes. Such changes are not necessarily indicative of any heart disease, but do constitute an abnormal EKG. There were no changes in the electrocardiograms examined by him, and the situation is stable. Since the initial EKG was taken on March 21, 1961, and no change thereafter developed for more than a year, in the opinion of Dr. Bilisoly nothing sudden or acute happened to Thornton's heart for a period of six weeks to two months prior to March 21, 1961. We are, of course, without the benefit of any EKG conducted on any of the libelants prior to March 5, 1961.

We think that a fair estimate of lost time of work occasioned by the injury of March 5 is approximately 9 or 10 days. His wage loss is fixed at $140.00. Some of these days were due to visits to the doctor but not all of such visits are included within the sum of $140.00 as longshoremen frequently make these visits on days when they are not employed.

The preponderance of the evidence does not establish that Thornton sustained any organic brain damage or that the non-specific wave changes disclosed on the EKG are attributable to the events of March 5, 1961. His chief complaints which may fairly be attributed to carbon monoxide exposure are headaches for not exceeding two months, some nausea for a brief period following the exposure, and slight dizziness for not more than two weeks. To arrive at the conclusion that organic brain damage or non-specific wave changes in the heart action are

chargeable to the carbon monoxide exposure would be pure speculation. Indeed, the complaints were of such a minimal nature that Thornton did not see fit to visit a doctor until after he heard that claims were being prosecuted against the shipowner.

■ An appropriate award for Thornton, including his expenses and loss of wages, is $2884.00 and a decree in his favor will be entered in No. 8201 against Victory Carriers, Incorporated, with interest from the date of the entry of the decree at the rate of 6% per annum.

### Sumler

Otis Sumler, one of the longshoremen who went into the #3 lower hold when the work commenced, remained below until some time between 3:30 and 4:00 P.M. when he was relieved by Bryant. He assigns as his reason for leaving that he felt sick and dizzy, "felt like I was going to fall out." After leaving the lower hold, he worked on the dock. Following the supper hour Sumler apparently returned to work in another hatch as he worked there until "about midnight." He then states that he went home and remained there for two or three days. He then visited his attorney's office and thereafter went to the doctor. According to Sumler, he was advised not to return to work but did so anyway.

Dr. Westmoreland testified that he first examined Sumler on March 21, having been referred to him by Dr. Whitlock, a surgeon who, in turn, had initially seen this longshoreman and others, at the request of legal counsel. Sumler's complaints were frontal headaches, some dizziness, and a tightness in his chest. Sumler told the doctor that he "was knocked unconscious" and that he "started feeling bad shortly after that." Upon examination his blood pressure and pulse were found to be entirely normal. In fact, the complete physical examination was negative. An EKG revealed a "premature ventricular contraction, which is an extra abnormal beat at intervals in the same lead." He was given a non-narcotic pain reliever for his headaches. On March 25 Sumler returned and stated that he felt better but was still quite tight in the chest. A chest x-ray was normal. The visits of March 27 and April 4 were essentially the same, with gradual improvement in the headaches noted on the latter visit. An EKG taken on June 16 revealed the same condition as observed on March 21. Seen again on July 10 and August 1 the findings were the same but on the latter date the urinalysis revealed a few white blood cells, indicating a small amount of infection in either kidney, but not attributable to carbon monoxide exposure. He was next seen on March 25, 1962, when an EKG disclosed the same findings as heretofore stated. The final examination on June 15, 1962, indicated that Sumler was feeling better, with occasional headaches and some "jumping sensation" in the chest, especially when doing strenuous work. Dr. Westmoreland summarized his views by concluding that Sumler has a combination involvement of the heart and brain, i. e., the same diagnosis as made in Thornton's case.

There is no evidence that Sumler was unconscious or even semi-conscious. Apparently he misinformed Dr. Westmoreland or was otherwise misunderstood. The total length of time he was in the #3 lower hold while the tractors were operating could not have exceeded two hours at the most.

Dr. Bilisoly agrees with Dr. Westmoreland as to the findings on Sumler's EKG being within normal limits with the exception of an occasional premature contraction. This condition is very common and may be caused by such simple factors as too much coffee, too many cigarettes, or too much excitement. It does not *per se* suggest heart disease.

Bearing in mind that Sumler worked continuously for 16 months after the accident, we believe that there is even less reason to conclude that he sustained any heart damage than with respect to Thornton. It is obvious that he sustained no organic brain damage.

For his headaches covering a period of two months, together with his other complaints, as well as his lost wages and medical expense, a decree will be entered in Sumler's favor in No. 8202 in the sum of $2263.00 against Victory Carriers, Incorporated, with interest from the date of the entry of said decree at the rate of 6% per annum.

## Harris

Charlie Harris, born March 2, 1913, was one of the longshoremen who entered the #3 hatch when it was first opened on March 5, 1961. He initially started to feel ill around 4:00 P.M. while on top of a conex van where he was storing some small boxes. He felt a tightness in his chest and "commenced getting dizzy." He came down from his position on top of the van, started back in the forward end to sit down, fell against a box striking his right shoulder, and then apparently passed out. When he came to, he was being held up by Gainar. After sitting down for a few minutes, he moved nearer the square of the hatch and climbed to the 'tween deck where automobiles were stored. Again he sat down and remembers nothing more until someone assisted him out by the escape hatch. He does not know when he left the 'tween deck but stated that they were still working below. Upon reaching the deck, the stevedore superintendent directed him to rest on a part of the ship's deck and when Harris got up it was then fairly late as it was during the meal hour. That night Harris stayed in the vicinity of one of the hatches the stevedore was working but performed no work and remained until the work was completed—presumably shortly after midnight—and then went with someone else to his sister's home in Norfolk where he spent the night. The following morning Harris drove to his home in South Mills, North Carolina, and that night went to a doctor (now deceased) at South Mills. The doctor prescribed something to clear his head and administered an injection to help his shoulder condition. He continued to visit the North Carolina doctor until June or July. He believes that he returned to work about eight days after March 5.

Harris' subjective symptoms were essentially the same as Thornton and Sumler. Occasional headaches and the tightness in the chest remain the principal complaints now that his shoulder has fully recovered. He kept no record of his absences from work after the first week. Like Thorton and Sumler, he filed no claim under the Longshoremen's and Harbor Workers' Act.

Dr. Westmoreland saw Harris on March 23, 1961, and thirteen times thereafter. Complaints of severe headaches, front and back, were sufficient to interfere with his sleep. His nausea had improved; his chest bothered him at times, particularly on the left side; his shoulder had some pain; his knees were weak. The routine physical examination was negative except for the pain over the top of the right shoulder. X-rays were negative of the heart and lungs, but did reveal a calcified bursitis in the shoulder, a condition that pre-existed the injury which is the subject matter of this controversy. The EKG, according to Dr. Westmoreland, did not show any abnormal beats, but did show changes which are consistent with abnormalities of the circulation of the heart muscle. Seen thereafter on March 25, 27, 30 and April 11, the shoulder had improved, but the headaches and "funny feeling" in the chest persisted. The doctor did not think that Harris had sufficiently recovered to return to work as of this latter date. On May 4 his condition had improved, although he still had some pain in the shoulder and chest, and his appetite was poor. He was doing some work as a longshoreman but was advised to refrain from lifting because of his shoulder. An EKG taken on June 15 disclosed the same findings as before. On June 30 his shoulder complaints had diminished but he still had pain over the heart. Thereafter, on August 14, his complaints were limited to his head and chest. Then on October 2 "he was still mentioning that his head bothered him" and "the chest

didn't seem to bother him, but he still had some trouble with it." Another complete examination, including an EKG, was given on March 13, 1962, with all findings remaining the same, except as to the shoulder which had healed. Examinations on March 23, April 6 and June 13, all followed the same pattern. Dr. Westmoreland's diagnosis of Harris is as follows:

"A. I think that he has been exposed to a sub-lethal dose of carbon monoxide gas, and that as a result of that he has gotten enough focalnecrosis of the brain to give him the headaches that he is having. Also, there are some changes on the electrocardiogram which we must assume is due to this, and also, he had an injury in his shoulder, not received from this condition, but from an aggravation of it."

Upon examination of the EKG tracings, Dr. Bilisoly testified that he could find no abnormality. True, the tracings showed a PR conduction time at the upper limits of normal but still within the normal range.

Once again the Court is not disposed to accept Dr. Westmoreland's diagnosis, and this is true even though it may be assumed that Harris lapsed into an unconscious state for brief moments. Clearly, we feel that there is no organic brain damage. As to the heart, if it indicates any changes whatsoever, it would be pure speculation to conclude that these changes would come about by reason of Harris' exposure to carbon monoxide.

■ Taking his medical and drug expenses, together with four weeks loss of wages, and bearing in mind his shoulder injury which aggravated a bursitis condition, a fair and reasonable award is $4000.00 for which a decree will be entered in No. 8203 against Victory Carriers, Incorporated, with interest from the date of the entry of the decree at 6% per annum.

Owens

Roland Owens has been employed as a longshoreman since 1941 and, as of June, 1962, was 45 years of age. He entered the #3 lower hold at approximately 1:30 P.M. He believes that the tractors started operating around 1:45 P.M. He estimates that between 3:00 and 3:15 P.M. he became "dizzy-headed" and thereafter went to the top deck. He returned to the hold about 4:00 P.M. and remained until the rest of the gang was ordered out at approximately 5:20 P.M. When he came topside the second time he had a severe headache and shortness of breath. Later that evening he worked the #1 hatch until midnight or shortly thereafter. He states that he remained at home for three days; thereafter went to see Dr. Westmoreland because of a sick headache; and remained out of work another three or four days. He claims to have visited Dr. Westmoreland on six or seven occasions and said: "Every time I get that sickness headache, I always go to him and have a check up." This does not indicate that his sick headaches are as numerous as he would have the Court to believe. In fact, Owens contends that he felt the same on the day he testified as immediately subsequent to March 5, 1961. Nevertheless, he has worked rather constantly when work was available. Maintaining no records as to days worked, Owens gives a "rough guess" of 30 days in 1961 and 18 to 20 days in 1962 absence due to headaches. Dr. Westmoreland testified that he first saw Owens on March 21, 1961. The pattern of his examination was similar to that of Thornton, Sumler and Harris. Once again he stated that he could not determine any cause for the headaches "although associated with the previous history you could assume it may be associated with it [carbon monoxide exposure]." Once again he noted certain changes on the EKG that were abnormal "and I assumed to be due to the anoxia associated with the exposure to carbon monoxide gas." He stated that he gave him phenaphen capsules for his headaches—a statement that conflicts with

Owens' testimony. He was next seen on April 11 with no change observed. On August 4 Owens complained of occasional headaches or dizziness. Again on March 13, 1962, the complaints, including tightness in the chest, were the same. Finally, on June 12, 1962, he had the same complaints but the EKG did not reveal any abnormal beat, although the first one taken on March 21, 1961, did disclose what Dr. Westmoreland described as some "irritable focus." As late as October 17, 1962—the day that Dr. Westmoreland concluded his testimony, Owens visited his office complaining of a severe headache and shortness of breath. Another EKG was in every respect normal. Dr. Westmoreland concluded that Owens had sustained some heart damage but had improved. As to the headaches, Dr. Westmoreland states that Owens sustained some brain damage which caused the headaches.

Dr. Bilisoly only examined the electrocardiograms taken on June 12, 1962, and October 17, 1962, as to Owens. They were, as Dr. Westmoreland said, normal. Dr. Westmoreland had misplaced the first EKG taken on March 21, 1961, which he referred to as abnormal.

In all events, we cannot accept the theory of Thornton, Sumler, Harris and Owens that they have sustained permanent heart damage or organic brain damage. Their claims, in the opinion of the Court have been over-exaggerated. We can appreciate the fact that headaches, dizziness and nausea would continue for a period of time following exposure to carbon monoxide but we cannot agree that medical science establishes, to the extent of any reasonable probability, that such a condition continues to exist over a period of many months. While the four men here involved are not the victims of "litigation neurosis" it can be safely said that they are most anxious to receive substantial awards.

■ Owens, in the opinion of the Court, has exaggerated his true condition more than the others. For his medical expense, an estimate of ten days disability, and an award for such injuries as he sustained on March 5, 1961, a decree will be entered in favor of Owens in No. 8211 against Victory Carriers, Incorporated, in the sum of $1750.00, plus interest from the date of the entry of the decree at the rate of 6% per annum.

## Separate Decrees

While these actions were consolidated for trial, the Court is confident that, as in most cases, the results obtained will not satisfy the respective parties. In order that separate appeals may be noted, separate decrees shall be presented. The cases may then be heard together on appeal.

## The Impleading Petitions.

■ Little need be said as to the right of Victory Carriers, Incorporated, to recover from Whitehall Terminal Corporation under the indemnity theory. It was Whitehall who was in charge of the loading operations as the expert stevedore under its warranty of workmanlike service. It was Whitehall who placed the tractors in the #3 lower hold with knowledge of the limited ventilation. It is the stevedore's obligation to provide, when necessary, the blowers or other mechanical ventilation. It was Whitehall's employees who operated the tractors and supervised the loading operations. While the respondent's first mate was guilty of negligence and the respondent's vessel was unseaworthy, these facts do not exonerate Whitehall for its breach of warranty of workmanlike service. Victory Carriers, Incorporated, is the beneficiary of the contract entered into between Isthmian Lines, Incorporated, and Whitehall. Full indemnity must follow. The matter of attorney's fees and expenses may be determined in the decrees to be entered or, by agreement, reserved pending action on appeal.

The libelants will recover their taxable costs.

Present decrees on notice.