Ollie M. DALTON, Plaintiff,

v.

AMERICAN PRESIDENT LINES,
Defendant.

No. C-69-649-SC.

United States District Court,
N. D. California,
San Francisco Division.

March 20, 1972.

Martin J. Jarvis, San Francisco, Cal.,
for plaintiff.

Warren W. Wilson, San Francisco,
Cal., for defendant.

MEMORANDUM

WALTER E. HOFFMAN, Chief
Judge (Under Designation).

In this proceeding under the Jones
Act, 46 U.S.C. § 688, plaintiff, formerly
the third assistant engineer aboard the
defendant's vessel, the SS PRESIDENT
TAYLOR, seeks a recovery for damages [1] occasioned by an alleged substantial loss of hearing when, on November 26, 1968, another third assistant engineer undertook the task of "blowing
down the water wall header" under circumstances which were not conducive to
safety with respect to others in the engine room.

The issues for determination may be
classified as follows: (1) Did the incident of November 26, 1968, occur; (2)
Was the plaintiff injured as a result
of said incident and, if so, to what extent; (3) Did the injury result in
whole or in part from the negligence
of Rockafellow, the third assistant engineer.

The case is based upon the alleged
negligence of a fellow crew member,
Rockafellow. While unseaworthiness is

[1] There is no claim for maintenance and
cure presented. Plaintiff has shown medical expense, including the cost of a hearing aid, aggregating $455.00. Even though
the plaintiff has not prevailed in this
action, he may still be entitled to reimbursement for medical expenses, independent of any injury, although he may
have forfeited his right to at least a portion of this expense under Roberson v.
SS American Builder, 265 F.Supp. 794
(E.D.Va., 1967). It seems, however, that
at least the cost of the hearing aid is
recoverable in an appropriate action as
this item is generally not available at the
United States Public Health Service Hospital.

alleged, we find no evidence which would justify any recovery on this ground.

The plaintiff, Dalton, was born in Virginia on December 20, 1904. He initially went to sea in 1945 and received his third engineer's license in 1948. From 1946 until June 1969, he worked for the defendant, American President Lines, as a third engineer. He has the equivalent of a high school education. He took retirement in February 1970, which action he attributes to his hearing difficulties although, admittedly, he had other problems including diabetes.

While Dalton first placed the date of the incident which allegedly caused the trauma to his ears, especially the right ear, during early December 1968, it was soon ascertained that the only occasion when the water wall header was blown down was on November 26, 1968, and it is this date upon which plaintiff now relies in his proof. Dalton's discovery deposition taken on August 19, 1970, reveals that the incident occurred in early December 1968, around 9:00 a. m., during plaintiff's 0800 to 1200 watch, shortly after the vessel had arrived in the Port of Los Angeles earlier that morning. The facts are that the vessel departed San Francisco at 0730 on November 16, 1968, and arrived at the harbor of Los Angeles on November 17 at 0230. At 0400 the starboard boiler was secured and the port boiler was retained as the steaming boiler until November 26, 1968, at 1330. The record demonstrates that the vessel remained at the pier from November 17, which was a Sunday, until December 5 when it returned to San Francisco arriving at 2:06 p. m.

Although the record does not disclose that Dalton reported the incident which he states gave forth an explosion-type noise which immediately affected his hearing, Dalton stated, on discovery, that he reported the incident to "Al Sells," the first assistant engineer. He was at this time positive that this was the person to whom the injury was reported. The crew list and the testimony of Halle R. Sells reveal that Sells, a first assistant engineer, was not aboard the vessel on this voyage, and had rejoined the ship at San Francisco on December 6. After Sells gave his deposition on June 7, 1971, Dalton, at the trial one month later, claimed that he reported the incident to one Haley and that Dalton could not remember the name prior to trial. Dalton concedes that he did not report any injury to the chief mate because his hearing had been partially restored and he wanted to see Dr. Wall, his personal physician, upon his return to San Francisco and prior to sailing to the Far East, even though he was aware of the policy of reporting any possible injury to the ship's officers.

Dr. Robert F. Wall testified by deposition on June 11, 1971—again only several weeks prior to trial. On discovery, Dalton claims to have visited Dr. Wall on some date between December 1 and December 12. He was positive in this assertion. At the trial Dalton testified that he had gone to Dr. Wall's office, after regular office hours when the doctor's staff had departed, and the doctor examined the right ear, noting that it was clear, and remarked that there was "nothing I can do" and "the injury has been done." Dr. Wall's records do not reflect this visit. In fact, no visits are shown on Dalton's records between November 11, 1968, and April 1, 1969. Dr. Wall had no recollection of seeing Dalton in December, or at anytime between November 11 and April 3, 1969.[2] While it is true that Dr. Wall did testify that Dalton had mentioned his hearing difficulties on about six occasions, Dr. Wall stated that he made no notation of same as Dalton was under the care of Dr. Kramer, a specialist. It is apparent, however, that Dalton's initial mention of any hearing problem to Dr. Wall was after he saw Dr. Kramer in July 1969.

2. It appears that Dalton went to the office on April 1, 1969, but did not wait and was given an appointment on April 3.

The evidence adequately establishes the fact that Dalton made no mention of any complaint to Dr. Wall, involving his ear condition, in December 1968, and thereafter until he visited Dr. Kramer.

Throughout Dalton's discovery deposition he insisted that he had never had any prior difficulties with his ears other than an occasional accumulation of wax. At the trial he testified that he had had no trouble with his hearing prior to November 1968 which was "work disabling." The medical record from Children's Hospital and Adult Medical Center discloses that Dalton was a patient on June 27–28, 1968, at which time he gave a history which reads "sometimes bad hearing, it changes, ringing in the ears." The physical examination given at that time reveals "external hearing bad." Obviously, Dalton had some knowledge of hearing difficulties prior to November 26, 1968, although it is entirely possible that it may not have reached the point of being "work disabling."

On April 13, 1970, Dalton reported to the M.E.B.A. Diagnostic Center for an evaluation for total and permanent disability. His complaints included several items with the notation "marked hearing loss" among them. By this time, of course, his ear condition had been ascertained by Dr. Kramer. His prior visit on June 9, 1969, revealed nothing detrimental under "Review of Systems," except that Dalton mentioned "sinus problems and post nasal drip." However, an audiogram was conducted which disclosed a "marked hearing loss on high frequencies, both ears;" the loss being 50 decibels at 2000 frequency and 55% loss at 4000 frequency for the right ear, and 50% loss at 2000 frequency and 65% at 4000 frequency for the left ear.[3]

We reach the conclusion that Dalton, upon ascertaining his marked hearing loss in June 1969, then proceeded to look back upon his many days in the engine room in an effort to reconstruct an incident which would give rise to an action against the shipowner. We make this statement with full knowledge of the fact that Dalton's testimony is, inferentially at least, supported by Rockafellow's deposition. This young man, does recall an instance, unidentified by day, month[4] or year, when Dalton said, "You don't need to blow it at that pressure," but asserts that Dalton made no complaint of any injury to his ears.

The procedure of blowing down a water wall header admittedly involves a loud noise. The purpose of this activity is to remove sediment from the water in the boiler, thereby permitting a specific level and control of the water. In the operation of the ship's boilers, the procedure is critical, especially with high pressure boilers which were on this vessel. There is a sharp conflict in the testimony as to the proper procedure. Plaintiff presented the testimony of Bird, a chief engineer who was purportedly familiar with B & W boilers, and who stated that it was improper procedure to blow down a boiler at 400 pounds per square inch, except in the case of an emergency. No emergency existed on November 26, 1968. Bird insists that the pressure should be reduced to 35 to 40 pounds per square inch before undertaking this task. The defendant's evidence is to the contrary. A Safety Manual for Marine Oil-Fired Watertube Boilers does not specify the accepted pressure.[5] Even Dalton disa-

---

3. This could possibly be erroneous as Dr. Kramer's testimony, and records supporting same, would indicate that the right ear is more adversely affected.

4. Rockafellow did answer a question directed to "early December" 1968, but it is obvious that he merely joins in the date of November 26, 1968, because of Dalton's reference to an incident occurring on that day and by reason of an entry in the engine room log.

5. It is important to note the distinction between a "bottom blow" (not applicable to this case) and "blowing down the water wall header." As applicable to this case, the Manual states:

   "The division wall headers, water screen headers, and water wall headers used

grees with his own expert, Bird, as Dalton contends that the pressure should be between 100 and 200 pounds, and that 35 to 40 pounds would not be sufficient. For this and other reasons as revealed by the record, we must reject the expertise of Bird.

To secure a boiler is to put the fire out. Before endeavoring to blow down the water wall headers it is necessary to let the pressure drop from the average pressure of 600. Once the boiler is secured, a couple of hours' wait will permit the sediment to take place, following which the water wall header can be blown. Competent engineers will blow down at pressures ranging from 200 to 400 pounds per square inch. Obviously, the higher the pressure is, the louder the noise will be.

■ There were two valves on the port boiler of the vessel. This is a safety factor with the second valve—opened second—serving as the working valve controlling the rate of blowdown. The first valve is opened wide. If the pressure is rather high, e. g. 400 pounds, the procedure is to crack the second valve slowly. If the pressure is low, the engineer can open the second valve wider. Dalton testified on discovery that Rockafellow performed the task at 550 pounds pressure. At trial, he confined his comments to the impropriety of blowing down the water wall header at 400 pounds. Rockafellow, admittedly vague on dates and times, stated that he usually blew down at 400 pounds. While Rockafellow had no independent recollection of looking at the gauge on November 26, 1968—assuming that he per-

formed the job on that afternoon—he earlier stated that the pressure was "about 400 pounds." Assuming arguendo that the date of November 26, 1968, is the correct date when the incident occurred and that Rockafellow opened the valves, we must conclude that he did so when the pressure was 400 pounds. This did give forth a loud noise and it is not unlikely that Dalton censored Rockafellow at that time but, for reasons heretofore stated, we cannot find that this incident proximately caused or aggravated the hearing loss which is the subject matter of this controversy.

There can be no doubt but that Dalton's hearing loss could have been caused or substantially contributed to by a concussive blast. Dr. Bogle did not see the plaintiff until March 4, 1970—long after the plaintiff had been advised of his marked hearing loss in June 1969. Dr. Kramer saw Dalton in July 1969 at which time plaintiff complained of an "opening and closing of the ears" during the previous three months. Dalton gave a history of hay fever, sinus, and working in the boiler room, but did not then mention any isolated incident of an explosive noise. On his visit of July 28, 1969, there is an entry "no explosion or noise" which was stricken out by the doctor when Dalton said that he worked in the boiler room. It was not until September 1969 that Dalton first told Dr. Kramer that he was subjected to escaping steam under pressure. The medical testimony, while conceding that a hearing loss can be the result of loud noises, also significantly points to a progressive loss which may well have oc-

---

in many boilers should never be blown down until after all burners on the boiler have been secured."
The port boiler on the PRESIDENT TAYLOR had been secured at 1330 and the starboard boiler had been put "on line" at 11:30 a. m. An entry appears *after* 1540 which reads "Gave mud drum, P. Blr., one gage glass bottom blow; gave each end of water wall header ½ gage glass blow." In discovery, Dalton said that he wrote the entry in the log book and had noted that Rockafellow gave the blow.

The log book does not mention Rockafellow at that point. At trial Dalton claimed that the entries under "Remarks" in 0800–1200 were in his handwriting, although his signature does not appear thereon. Assuming that Dalton made the entries in 0800–1200, it is obvious that he did *not* make the entry quoted above in 1200–1600. At trial, Dalton admitted that he did not make this latter entry, but counters with the suggestion that sometimes the blow occurs twice in a day.

curred by reason of the accumulation of loud noises in the engine room over a period of time. If this is the reason for the hearing loss, it is in the nature of an occupational disease for which the defendant is not liable under the Jones Act.

The engine room of any vessel is a noisy place. There is no method yet devised which is conducive to silence. There is no quiet way of blowing a water wall header. Blowing the tubes probably creates even a greater noise. Infrequently the engine room crew uses ear plugs or rags to lessen the noise trauma. While this is permissible during the blowing of a boiler, it is not mandatory and, under other circumstances, would not be permitted as it would be impossible to hear orders or the telephone, especially in the event of an emergency.

There is a sharp dispute between Dalton and Rockafellow as to whether any advance information was given to the engine room crew that the water wall headers were about to be blown. Plaintiff states that no warning was given. Rockafellow contradicts Dalton on this point. While there is some testimony to the effect that the individual blowing down the water wall header should notify the fireman due to the dropping of the water gauge, and would likewise notify anyone in the area of the tank tops because of escaping steam, there is no fixed requirement relative to any warning. Bearing in mind the continuous loud noises in the engine room and mindful of the safety regulations which are the subject of negotiation between unions and shipowners, the court does not feel that any particular exception should be characterized as negligence, assuming arguendo that no warning was given, in the absence of a safety regulation which has not been made a part of this record. Moreover, Dalton's credibility has been seriously challenged by reason of what appears from the evidence.

Counsel direct the court's attention to DeMarco v. United States, 204 F.Supp. 290 (E.D.N.Y., 1962). The language of Judge Dooling, a distinguished authority in the admiralty field, affords some comfort to the defendant in the following statement:

> "Libellant alone fainted. That might suggest an unforeseeable susceptibility on his part but for the evidence that the symptoms that preceded his fainting did not differ in kind from those of his fellow workers and that libellant had no record of proneness to faint."

While the dictum above may be grounds for argument in a fainting case, we do not think it particularly apposite in a case involving loss of hearing because of the nature of the ailments, the cause of same, and the facts and circumstances surrounding the alleged injury. We do not base this opinion upon *DeMarco* [6] which was an obvious case of excessive fumes in the lower hold with no ventilation system in operation. We must recognize that the reaction to excessive noise will vary according to the individual. The same is true as to excessive fumes [7] and many other conditions.

For the foregoing reasons we must reject the plaintiff's claim that his loss of hearing resulted, in whole or in part, from the incident of November 26, 1968. A judgment in favor of the defendant, with taxable costs, has this day been entered.

6. DeMarco v. United States, supra, is cited with approval in an opinion written by the undersigned district judge in Gainar v. SS Longview Victory, 226 F.Supp. 912 (E.D.Va., 1964).

7. Gainar v. SS Longview Victory, 226 F. Supp. 912 (E.D.Va., 1964).